```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA


VINCENT J. SMITHSON                       CIVIL ACTION


VERSUS                                    NO.   07-3953


TENET HEALTH SYSTEM                       SECTION "R" (4)
HOSPITALS, INC., ET AL.
```

## ORDER AND REASONS

Before the Court are cross-motions for Summary Judgment. For the following reasons, the Court DENIES these motions.

### I.  Background

On August 4, 2005, at about 7:15 a.m., plaintiff Vincent J. Smithson arrived at the emergency room at Northshore Regional Medical Center with an eye injury. Smithson complained that a foreign object had entered his left eye while using a weedeater 10 to 15 minutes earlier on the lawn of Northshore Regional Medical Center. Smithson was immediately seen by the Emergency Room physician, Dr. Ernest Hansen. Hansen diagnosed the plaintiff with an "open globe injury." Within five minutes of seeing the patient, Hansen consulted via telephone with Dr. Terrell Hemelt, the on-call ophthalmology consultant. (R. Doc. 69-2 at 15). Hemelt told Hansen to order a CAT scan to see if there was a foreign body in the patient's globe. After the CAT

scan, at around 9:45 a.m., Hanson called Hemelt with the results, and Hemelt told him to prepare the preoperative lab work. (R. Doc. 69-2 at 16). Hemelt told Hanson that he would be in for surgery around noon, after his clinic. (R. Doc. 69-2 at 16). When Hemelt arrived, he told plaintiff he needed surgery for urgent repair. But at about 2:30 p.m., plaintiff was transferred to the Medical Center of Louisiana at New Orleans (Charity Hospital).

The facts surrounding the transfer are in dispute. Hemelt testified that plaintiff asked to be transferred after hearing that his fees were "$1,000 to $2,000" for surgery. (R. Doc. 69-3 at 40). Hemelt also asserts that he informed plaintiff of the risks of transfer and advised him to have the surgery at Northshore. Plaintiff asserts that Hemelt informed him and his mother that surgery would be unaffordable and that it was safe to transfer him to Charity Hospital. (R. Doc. 70-8 at 11). Plaintiff recalls that he overheard a conversation between his mother and a doctor to the effect that without insurance or Medicaid, all the hospital could do was transfer him. (R. Doc. 70-8 at 11). He remembers that the conversation made his mother cry (R. Doc. 70-8 at 11), and that he was scared. (R. Doc. 70-8 at 11-12). Still, plaintiff admits he does not remember much of the events of that day. His mother signed the form requesting his transfer. (*See* R. Doc. 65-8 at 2). On the form, Hemelt

certified plaintiff as stable prior to transfer.

To prepare Smithson for transfer, Hemelt put a shield over Smithson's eye and instructed him not to rub his eye. (R. Doc. 60, Exhibit F at 38). Hemelt also gave Smithson antibiotics intravenously, but he did not inject them directly into his eye. (R. Doc. 60, Exhibit F at 38-39).[1] Additionally, Smithson was nauseated prior to transfer, and Dr. Hansen administered him an antiemetic so that his intraocular pressure would not increase from vomiting. (R. Doc. 69-2 at 8). At 2:30 p.m., Smithson left via ambulance for Charity Hospital. Smithson arrived at 4:55 p.m. Smithson waited in the emergency room at Charity, was not examined until 7:30 p.m., and went into surgery at 10:30 p.m., about 15 hours after arriving at the Northshore emergency room. The next morning, the doctors detected an infection in Smithson's eye, and three days later, his eye was removed.

On August 3, 2007, plaintiff sued Tenet Healthsystem Hospitals, Inc. d/b/a Northshore Regional Medical Center, Terrell Hemelt, M.D.,[2] and Louisiana State University Health Care Services Division, Medical Center of Louisiana at New Orleans.[3]

---

[1] Hemelt explained that he would have injected antibiotics into plaintiff's eye in the operating room before surgery. (R. Doc. 60, Exhibit F at 39).

[2] Hemelt was later dismissed with prejudice. (*See* R. Doc. 20).

[3] The Medical Center of Louisiana at New Orleans was later dismissed for lack of subject matter jurisdiction. (*See* R. Doc.

Plaintiff asserts that defendants violated the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA") by (1) failing to provide an appropriate medical screening for the plaintiff, (2) failing to give plaintiff stabilizing treatment, and (3) discouraging plaintiff from remaining at Northshore because he lacked insurance.  Defendant Northshore Regional Medical Center now moves for summary judgment on all claims.  Plaintiff Smithson moves for partial summary judgment on the issues of appropriate screening and stabilizing treatment.

## II.  Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

---

35).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**III. Discussion**

Congress enacted EMTALA to prevent "patient dumping" — not as a federal malpractice statute. *Marshall v. East Carroll Parish Hosp*, 134 F.3d 319, 322 (5th Cir. 1998).  The statute was passed to prevent hospitals from refusing to treat indigent or underinsured patients. *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1136-37 (8th Cir. 1996) ("A patient is 'dumped' when he or she is shunted off by one hospital to another, the second one being, for example, a so-called 'charity institution'").  EMTALA requires that all participating hospitals

meet three standards of care for any individual who comes in for emergency medical care. The hospital must: (1) provide an appropriate medical screening, (2) stabilize known emergency medical conditions, and (3) abide by restrictions on transferring an unstabilized individual to another medical facility. *See* 42 U.S.C. § 1395dd(a)-(c). *See Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000). Plaintiff alleges that Northshore violated each of these requirements.

### A.  Appropriate Screening

The Court finds that summary judgment is not appropriate for plaintiff's claim that Northshore did not provide an appropriate medical screening as required under 42 U.S.C. § 1395dd(a). An appropriate medical screening examination is determined by whether the screening "was performed equitably in comparison to other patients with similar symptoms." *Battle*, 228 F.3d at 557 (citing *Marshall*, 134 F.3d 319 at 322); *see also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994) ("[EMTALA] requires a hospital to provide indigent patients with a medical screening similar to one they would provide any other patient"); *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996) ("An inappropriate screening examination is one that has a disparate impact on the plaintiff"). If the hospital provided an appropriate medical screening, it is not liable under EMTALA even if the physician made a misdiagnosis. *Marshall*, 134 F.3d at 322.

The failure to appreciate the extent of a patient's injury or the failure to order an additional diagnostic procedure will not result in EMTALA liability. *Id.* at 323. The plaintiff has the burden of showing that he received disparate treatment from other patients. *Id.* at 323-24. Plaintiffs can prove disparate treatment by providing evidence that a hospital did not follow its own screening procedures. *Battle*, 228 F.3d at 558; *Repp v. Anadarko Mun'l Hosp.*, 43 F.3d 519 (10th Cir. 1994) (finding that a hospital is in the best position to assess its capabilities and thus violates EMTALA when it does not follow its own standard procedures). Still, a *de minimus* departure from a hospital's standard procedure does not amount to a violation of hospital policy. *See Repp v. Anadarko Mun'l Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994).

Plaintiff asserts that Northshore violated its own EMTALA screening procedure, and thus treated him disparately. Northshore's EMTALA policy requires the following:

> On-call physicians shall respond to Hospital calls for emergency coverage within a reasonable time (30-60 minutes) after receiving communication indicating that their attendance is required. If an on-call specialist or sub-specialist is not available, the emergency department physician or his or her designee shall attempt to obtain the services of another appropriate specialist or subspecialist. . .

7

(R. Doc. 60-7 at 6). Plaintiff asserts that Northshore violated this policy when it failed to ensure that Dr. Hemelt, the on-call ophthalmologist, responded timely to plaintiff's emergent situation.

Whether a hospital's departure from its policy establishes disparate treatment is a question of fact. *See Battle*, 228 F.3d at 558. In *Battle*, plaintiffs claimed Memorial Hospital violated EMTALA by breaching a hospital standard providing that "'[i]nfants and elderly are usually hospitalized if no definitive source for fever/infection' is determined." *Id.* The defendant argued that its doctors had diagnosed the patient, an infant, with pneumonia and an ear infection, and thus the doctors had identified a definitive source for the fever/infection. *Id.* The court found that defendant's explanations as to why the hospital did not follow its policy required credibility determinations that precluded judgment as a matter of law. Similarly here, there is a genuine issue of material fact as to whether Northshore violated its policy. Northshore's policy requires that on-call physicians respond within a reasonable time, which it states to be 30-60 minutes, after receiving communication that their attendance is required. Dr. Hemelt arrived at the hospital over four hours after Dr. Hansen called him. Defendant claims that the phrase "shall respond" in Northshore's policy permitted Hemelt to respond by calling in a

8

CAT scan and awaiting the results, rather than appearing at the emergency room to see the patient (R. Doc. 60-1 at 7). Northshore's corporate representative for EMTALA, however, provided contradictory testimony as to the meaning of "response." (R. Doc. 60-8 at 9). The representative, Brenda Ashley, first testified that response time means physically coming to the emergency room. (R. Doc. 60-8 at 9). Later in her deposition, Ashley said that the physicians had 30-60 minutes to "call back" the hospital. (R. Doc. 60-8 at 9). Further, plaintiff has pointed to the hospital guidelines (See R. Doc. 70-6 at 3), which contradict defendant's assertion that response means calling in. The guidelines state:

> that "[i]f a physician on the list is called by the hospital to provide emergency screening or treatment and either refuses or fails *to arrive* within the response time established by hospital policies or medical staff bylaws, the hospital may be in violation of EMTALA.

(emphasis added). The guidelines provide evidence that the "shall respond" in the hospital's EMTALA policy refers to a doctor's actual presence at the emergency room. The guidelines further state that whether the on-call physician must physically assess the patient in the emergency department is the decision of the treating emergency physician. (R. Doc. 70-6 at 2). Hemelt testified that Hansen told him the patient needed an ophthalmic evaluation. Thus, Hemelt did have a duty to arrive at the

emergency room in a reasonable time.  Whether his arrival at the emergency room four and a half hours after Hansen called him was reasonable is a genuine issue of fact.  Further, if the hospital's policy required Hemelt to attend to plaintiff in person within 30 to 60 minutes, a delay of several hours in treating plaintiff would not be a *de minimus* violation of hospital policy, and thus the issue of fact is material.  *Cf. Repp*, 43 F.3d at 523 (failure to take complete medical history and failure to ask patient which medications he takes were *de minimus* violations); *Feighery v. York Hosp.*, 59 F. Supp. 2d 96, 108 (D. Me. 1999) (failure to weigh patient and failure to conduct neuro tests were *de minimus* violations).  Since there are genuine issues of material fact as to whether Northshore violated its protocol and whether this violation amounted to disparate treatment, summary judgment is not appropriate for this issue.

**B.   Stabilization and Transfer**

The Court finds that an issue of material fact exists as to whether Northshore provided plaintiff with stabilizing treatment before his transfer.  For known medical emergencies, EMTALA requires a hospital to provide either:

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

10

>     (B) for transfer of the individual to another medical
>     facility in accordance with subsection (c) of this
>     section

See 42 U.S.C. § 1395dd(b)(1). If the hospital does not stabilize the patient, it cannot transfer the patient unless certain conditions are met. See discussion, infra. Thus to succeed on a § 1395dd(b) claim, plaintiff must present evidence that the patient had a medical emergency that the hospital knew of prior to transfer, the patient was not stabilized prior to transfer, and the unstabilized transfer of the patient did not meet the requirements of § 1395dd(c). See Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994). It is undisputed that plaintiff had an emergency medical condition and that the hospital knew of the condition. Thus the Court must consider whether patient was stabilized before his transfer, and, if not, whether the transfer nevertheless satisfied the requirements of § 1395dd(c).

Under EMTALA, to "stabilize" means to provide medical treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." § 1395dd(e)(2)(B). The duty to stabilize arises only when a hospital has actual knowledge that the patient has an unstabilized medical emergency. Battle, 228 F.3d at 558; see also Marshall, 134 F.3d at 325 (holding that

plaintiff had no stabilization claim when the doctor determined that she did not have an emergency medical condition). Whether a patient has been stabilized as defined by EMTALA requires factual considerations. *See Ardary v. Aetna Health Plans of California, Inc.*, 98 F.3d 496, 498, n.2 (9th Cir. 1996). Plaintiff raises a material fact issue when he presents evidence that puts into question whether at the time of transfer, "no material deterioration" was likely. *See Delaney v. Cade*, 986 F.2d 387, 392-93 (10th Cir. 1993); *see also Romo v. Union Mem'l Hosp., Inc.*, 878 F. Supp. 837, 843 (W.D.N.C. 1995) (conflicting evidence regarding patient's stability precluded summary judgment).

There is a genuine issue of material fact as to whether plaintiff was stabilized at the time of transfer. Although Dr. Hemelt certified plaintiff as "stable" before his transfer, EMTALA requires that a patient be stabilized as defined in § 1395dd(e)(3)(B), which provides that at the time of transfer, "no material deterioration" of his condition was likely. Plaintiff's experts suggest that surgery was the only means of stabilizing an open globe injury.[4] Plaintiff's expert Dr. Richard Bucci reported that any delay in treatment of an open globe would "result in loss

---

[4] Plaintiff's reliance on expert testimony is appropriate since the Fifth Circuit defines "to stabilize" as "'[t]reatment that medical experts agree would prevent the threatening and severe consequence of' the patient's emergency medical condition while in transit." *Battle*, 228 F.3d at 559 (quoting *Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991)).

of tissue" and "progressively increase the risk of infection." (R. Doc. 60-5 at 2). Plaintiff's expert Dr. Richard Newsome further testified that plaintiff did not receive stabilizing treatment before his transfer and that the delay involved in transfer contributed to the condition that caused the loss of plaintiff's eye. (R. Doc. 70-3 at 4). Plaintiff was still nauseated and experiencing severe pain 10 minutes before his transfer to Charity. (R. Doc. 70-3 at 3). Further, plaintiff did not receive any injections of antibiotics into his eye to help prevent infection — he only received an eye shield and medications for pain and nausea. (R. Doc. 70-3 at 3). Plaintiff's treating physician, on the other hand, has testified that plaintiff was stable prior to transfer, and that no material deterioration of his condition was likely to result from the transfer. (R. Doc. 69-3 at 49). As such, there is a genuine issue of material fact as to whether plaintiff was stabilized within the meaning of EMTALA prior to transfer.

Still, EMTALA allows a hospital to transfer an unstabilized if:

> (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,
>
> (ii) a physician . . . has signed a certification that based upon the information available at the time of

> transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . or
>
> (iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person . . . has signed a certification clause . . . and
>
> (B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

42 U.S.C. § 1395dd(c)(1). The statute defines an appropriate transfer as a transfer:

> (A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;
>
> (B) in which the receiving facility --
>> (i) has available space and qualified personnel for the treatment of the individual, and
>>
>> (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;
>
> (C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented . . .
>
> (D) in which the transfer is effected through qualified personnel and transportation equipment . . . and
>
> (E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred.

§ 1395dd(c)(2).

Here, plaintiff's mother signed the request for transfer to Charity Hospital. Additionally, Dr. Hemelt testified that he informed plaintiff of the risks of transfer. (R. Doc. 69-3 at 11). But other issues of fact preclude summary judgment. Plaintiff's testimony creates an issue of material fact as to whether Hemelt informed him and his mother of the hospital's EMTALA obligations, as required under § 1395dd(c)(1)(A)(i) for unstabilized transfers. Plaintiff asserts that he overheard a doctor tell his mother that without insurance or Medicaid, he needed to transfer, and that they transferred for this reason. (R. Doc. 70-8 at 11). Plaintiff further testified that no one told him that the hospital would perform the surgery, and that he did not remember anyone telling him of the risks of transfer. (R. Doc. 70-8 at 12). Plaintiff also recalled that he was scared. (R. Doc. 70-8 at 11-12). From these statements, it can be inferred that plaintiff did not understand the hospital's obligation under EMTALA to provide stabilizing treatment. Additionally, while Hemelt testified that he informed plaintiff of the risks of transfer, he did not state that he also informed plaintiff of the hospital's EMTALA obligations. *See* § 1395dd(c)(1)(A)(i). Thus there is an issue of fact as to whether plaintiff and his mother were informed of the hospital's EMTALA obligations. The fact is material since, without knowledge of the hospital's EMTALA obligations, the

15

plaintiff's transfer request cannot exempt the hospital from the stabilization requirement. § 1395dd(c)(1)(A)(i) (a hospital may not transfer an unstabilized individual unless "the individual . . . *after being informed of the hospital's obligations under this section* and of the risks of transfer, in writing requests transfer to another medical facility") (emphasis added). Further, the Court finds that an issue of material fact exists as to whether the transfer was "appropriate," particularly whether the transferring hospital provided the treatment within its capacity which minimizes the risk to the patient's health.

## IV. Conclusion

For the foregoing reasons, the Court DENIES both parties' motions for summary judgment.

New Orleans, Louisiana, this 30th day of July 2008.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE