```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


VINCENT J. SMITHSON                   CIVIL ACTION


VERSUS                                NO.  07-3953


TENET HEALTH SYSTEM                   SECTION "R" (4)
HOSPITALS, INC., ET AL.
```

## ORDER AND REASONS

Before the Court is plaintiff Vincent Smithson's Renewed Motion for Judgment as a Matter of Law or, Alternatively, Motion for a New Trial. For the following reasons, the Court DENIES both motions.

### I. Background

#### A. Procedural History

On August 3, 2007, Vincent Smithson sued NorthShore Regional Medical Center, Inc. and NorthShore Regional Medical Center, LLC (known collectively as "NorthShore") for alleged violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd. On July 30, 2008, the Court denied NorthShore's motion for summary judgment and Smithson's motion for partial summary judgment. (R. Doc. 116). The Court held a jury trial on Smithson's claims on August 4-6, 2008. At the close of plaintiff's evidence, the Court denied Smithson's motion for

judgment as a matter of law.  The jury returned a verdict in favor of NorthShore.  Smithson now moves for judgment as a matter of law under Fed. R. Civ. P. 50, or in the alternative, for a ne trial under Fed. R. Civ. P. 59.

    **B.**    **Factual Background**

On August 4, 2005, at about 7:15 a.m., Smithson arrived at the emergency room at NorthShore Regional Medical Center with an eye injury.  Smithson complained that a foreign object had entered his left eye while he used a weedeater 10 to 15 minutes earlier on the lawn of NorthShore Regional Medical Center.  Smithson was seen immediately by the Emergency Room physician, Dr. Ernest Hansen.  Hansen diagnosed the plaintiff with an "open globe injury."  Within five minutes of seeing the patient, Hansen consulted via telephone with Dr. Terrell Hemelt, the on-call ophthalmology consultant. (R. Doc. 69-2 at 15).  Hemelt told Hansen to order a CAT scan to see if there was a foreign body in the patient's globe.  After the CAT scan, at around 9:45 a.m., Hansen called Hemelt with the results, and Hemelt told him to prepare the preoperative lab work. (R. Doc. 69-2 at 16).  Hemelt told Hansen that he would be in for surgery around noon, after his clinic. (R. Doc. 69-2 at 16).  When Hemelt arrived, he told plaintiff he needed surgery for urgent repair.  But at about 2:30 p.m., plaintiff was transferred to the Medical Center of Louisiana at New Orleans (Charity Hospital).  On the transfer

form, he was certified as "stable for transfer."

At 2:30 p.m., Smithson left via ambulance for Charity Hospital. Smithson arrived at 4:55 p.m. Smithson waited in the emergency room at Charity, was not examined until 7:30 p.m., and went into surgery at 10:30 p.m., about 15 hours after arriving at the NorthShore emergency room. The next morning, the doctors detected an infection in Smithson's eye, and three days later, his eye was removed.

## II. Legal Standard

### A. Judgment as a Matter of Law

The Court will grant judgment as a matter of law under Rule 50 only when the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a different verdict. *Arsement v. Spinnaker Exploration Co., L.L.C.*, 400 F.3d 238, 248-49 (5th Cir. 2005). The Court will consider all of the evidence, and draw factual inferences in favor of the verdict. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003). The Court, however, leaves credibility determinations, the weighing of the evidence, and the drawing of all legitimate inferences from the facts to the jury. *Id*. A mere scintilla of evidence, however, "'is insufficient to present a question for the jury'" as "'there must be a conflict in substantial evidence to create a jury

question.'"  *Id*. (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997).  In addition, when a party fails to move timely for judgment as a matter of law on an issue, the party waives that issue for purposes of judgment as a matter of law.  *See Polanco v. City of Austin, Tex.*, 78 F.3d 968, 974 (5th Cir. 1996).

   **B.   New Trial**

Rule 59(a) provides that the Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. Proc. 59.  Therefore, the Court may grant a new trial if it finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course.  *See Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985).  When a party moves for a new trial on evidentiary grounds, the Court will not grant a new trial unless "the verdict is against the great weight of the evidence."  *Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir. 1998).

**III. Discussion**

Congress enacted EMTALA to prevent "patient dumping" — not as a federal malpractice statute.  *Marshall v. East Carroll Parish Hosp*, 134 F.3d 319, 322 (5th Cir. 1998).  The statute was

4

passed to prevent hospitals from refusing to treat indigent or underinsured patients. *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1136-37 (8th Cir. 1996) ("A patient is 'dumped' when he or she is shunted off by one hospital to another, the second one being, for example, a so-called 'charity institution'"). EMTALA requires that all participating hospitals meet three standards of care for any individual who comes in for emergency medical care. The hospital must: (1) provide an appropriate medical screening, (2) stabilize known emergency medical conditions, and (3) abide by restrictions on transferring an unstabilized individual to another medical facility. *See* 42 U.S.C. § 1395dd(a)-(c). *See Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000). At trial, plaintiff alleged that NorthShore violated all of these requirements.

    **A.    Disparate Treatment**

Plaintiff asserts that the verdict goes against the great weight of the evidence, which he contends establishes that NorthShore violated 42 U.S.C. § 1395dd(a). The relevant provision provides that "a hospital must provide an appropriate medical screening examination within the capabilities of the hospital's emergency department." 42 U.S.C. § 1395dd(a). Courts have interpreted this provision to require the screening to be "performed equitably in comparison to other patients with similar

symptoms." *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) (quoting *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998)). "An inappropriate screening is one that has a disparate impact on the plaintiff." *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996). Evidence that a hospital did not follow its own screening procedures can support a finding of disparate treatment. *Battle*, 228 F.3d at 558.

Plaintiff points to the allegedly "uncontroverted" expert testimony of its four experts — Dr. Paul Blaylock, Dr. David Newsome, Dr. Richard Bucci, and James Sturcke, R.N. — that NorthShore violated its own hospital policies. Plaintiff argues that the jury verdict goes against the great weight of this evidence. The Court finds, however, that the jury could have reasonably rejected this evidence. For one thing, plaintiff provided no evidence of how other patients with similar injuries are treated at NorthShore. In fact, plaintiff's two treating physicians, Dr. Terrell Hemelt and Dr. Ernest Hansen, testified that Smithson received the same treatment that other patients with open globe injuries commonly receive. Thus while evidence that a hospital failed to follow its own policies *can* support a finding of disparate treatment, defendants offered evidence to the contrary that the jury could have reasonably accepted.

Additionally, Dr. Hansen and Dr. Hemelt testified that the

6

hospital had not violated its EMTALA policy.  The relevant provision of the policy requires the following:

> On-call physicians shall respond to Hospital calls for emergency coverage within a reasonable time (30-60 minutes) *after receiving communication indicating that their attendance is required*. If an on-call specialist or sub-specialist is not available, the emergency department physician or his or her designee shall attempt to obtain the services of another appropriate specialist or subspecialist. . .

(R. Doc. 60-7 at 6) (emphasis added).  Both Dr. Hansen and Dr. Hemelt testified that the policy was not violated since there was never any communication indicating that Dr. Hemelt's presence was required.  Dr. Hansen testified that, since he was certain that Smithson's injury was an open globe, he never told Dr. Hemelt that he needed him there immediately.  Dr. Hemelt similarly testified that Dr. Hansen did not request his immediate presence.  Both doctors testified that it was obvious that plaintiff needed surgery and that Dr. Hemelt's presence was not required while the plaintiff was prepped for surgery.  The jury could have reasonably accepted this testimony and determined that the hospital's EMTALA policy was not violated.  Accordingly, there is ample evidence to support the jury's finding that the hospital did not screen the plaintiff disparately and thus did not violate the screening requirement of EMTALA.

Plaintiff also argues that NorthShore violated the screening requirement by failing to give him a visual acuity test.

Plaintiff asserts that "[a]n appropriate medical screening would have included a visual acuity examination." Whether a screening is appropriate, however, turns on disparate impact. *See Battle,* 228 F.3d at 557. Plaintiff has provided no evidence to suggest that the hospital treated him differently from other patients by failing to administer this test. Accordingly, as the jury had no evidence on which to base a finding of disparate treatment in this context, its finding that there was no screening violation is reasonable.

Plaintiff also asserts that an appropriate medical screening would include a timely examination by an ophthalmology specialist. But again, plaintiff has provided no evidence of disparate treatment in this regard.

**B.  Stabilization and Transfer**

Plaintiff avers that the great weight of the evidence establishes that he was not provided stabilizing treatment before his transfer. For known medical emergencies, EMTALA requires a hospital to provide either:

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

*See* 42 U.S.C. § 1395dd(b)(1). If the hospital does not stabilize the patient, it cannot transfer the patient unless certain

conditions are met. *See* 42 U.S.C. § 1395dd. Thus to succeed on a § 1395dd(b) claim, plaintiff must present evidence that the patient had a medical emergency that the hospital knew of prior to transfer, the patient was not stabilized prior to transfer, and the unstabilized transfer of the patient did not meet the requirements of § 1395dd(c). *See Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994).

Under EMTALA, to "stabilize" means to provide medical treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." § 1395dd(e)(2)(B). The duty to stabilize arises only when a hospital has actual knowledge that the patient has an unstabilized medical emergency. *Battle*, 228 F.3d at 558; *see also Marshall*, 134 F.3d at 325 (holding that plaintiff had no stabilization claim when the doctor determined that she did not have an emergency medical condition). Whether a patient has been stabilized as defined by EMTALA requires factual considerations. *See Ardary v. Aetna Health Plans of California, Inc.*, 98 F.3d 496, 498, n.2 (9th Cir. 1996).

Plaintiff asserts that the great weight of the evidence establishes that he was not provided stabilizing treatment. In particular, plaintiff claims that the evidence shows he did not receive stabilizing treatment since: (1) an eye shield was not

9

immediately placed on his eye; (2) antibiotics were never injected into his eye; and (3) his open globe was not closed at NorthShore.

The experts of both parties disputed whether plaintiff was stable, as defined in EMTALA, without these three procedures. Both parties agreed that plaintiff had an eye shield over his eye during his transfer, although the parties disputed how soon the eye shield was placed over his eye. As for the lack of an antibiotics injection, the experts disputed whether this procedure would even be beneficial to plaintiff. The experts also disputed whether closing plaintiff's open globe was necessary to stabilize him. Plaintiff's expert, Dr. David Newsome, testified that an open globe injury cannot be stabilized until the open globe is sewn shut. Plaintiff's other experts, Dr. Blaylock and Dr. Bucci, also testified that plaintiff was not stable for transfer. Defendant's expert Dr. Michelle Haydel, the emergency room physician who received plaintiff at Charity Hospital, testified that stitching up the globe is not necessary to stabilize an open globe injury. Dr. Haydel further testified that her emergency room often receives transfer patients whose open globe injuries have not been sewn shut. Smithson's treating physicians, Dr. Hemelt and Dr. Hansen, also testified that closing an open globe immediately is not necessary to stabilize such an injury. The defense also presented testimony that

10

closing an open globe is not appropriate before the doctors ascertain whether there is a retained foreign body in the patient's eye. The jury was thus presented with contradictory evidence with regard to plaintiff's stability. The jury could have reasonably accepted the testimony of the physicians who actually treated plaintiff at NorthShore and Charity Hospital over the testimony of plaintiff's retained expert witnesses.

Alternatively, the jury could have decided that even if the plaintiff was unstable for transfer, his transfer met the conditions for unstabilized transfer. EMTALA allows a hospital to transfer an unstabilized patient if:

> (A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,
>
> (ii) a physician . . . has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . or
>
> (iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person . . . has signed a certification clause . . . and
>
> (B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

42 U.S.C. § 1395dd(c)(1). The statute defines an appropriate transfer as a transfer:

>    (A) in which the transferring hospital provides the
>    medical treatment within its capacity which minimizes
>    the risks to the individual's health and, in the case
>    of a woman in labor, the health of the unborn child;
>
>    (B) in which the receiving facility --
>        (i) has available space and qualified personnel
>        for the treatment of the individual, and
>        (ii) has agreed to accept transfer of the
>        individual and to provide appropriate medical
>        treatment;
>
>    (C) in which the transferring hospital sends to the
>    receiving facility all medical records (or copies
>    thereof), related to the emergency condition for which
>    the individual has presented . . .
>
>    (D) in which the transfer is effected through qualified
>    personnel and transportation equipment . . . and
>
>    (E) which meets such other requirements as the
>    Secretary may find necessary in the interest of the
>    health and safety of individuals transferred.

§ 1395dd(c)(2).

The evidence showed that plaintiff's mother signed a transfer request form. The parties disputed whether it was appropriate for his mother to sign the form, but the jury could have reasonably found that his mother's signature was sufficient since plaintiff was on pain medication and had difficulty reading due to his injury. The jury was also presented conflicting testimony as to whether the plaintiff *actually* requested transfer or was coerced into the transfer. Plaintiff testified that he requested transfer because he was told that without insurance, it was his only option. Plaintiff also testified, however, that he suffered repeated blackouts that day and only remembered a small

amount of his time at NorthShore. Dr. Hemelt testified that plaintiff raised the issue of cost and then requested transfer to Charity, where he would probably not have to pay for the procedure. Dr. Hemelt further testified that he strongly recommended that the plaintiff stay at NorthShore and undergo surgery immediately. Dr. Hemelt testified that he was ready to perform the surgery, but plaintiff insisted on the transfer against his advice. Given plaintiff's own testimony that he repeatedly blacked out and did not remember much of that day, the jury could reasonably have accepted Dr. Hemelt's testimony concerning plaintiff's transfer request. Additionally, the jury had sufficient evidence to find that plaintiff was informed of the risks of transfer, as Dr. Hemelt testified that he told plaintiff of the risks of transfer, and the signed transfer form listed a risk of transfer as "decrease in vision." Accordingly, the jury's verdict is not against the great weight of the evidence.

### D. Causation

Plaintiff argues that the great weight of the evidence shows that NorthShore's EMTALA violations caused and contributed to the loss of his eye. The jury, however, did not reach the causation issue, since they found that NorthShore did not violate EMTALA. As the Court finds that the verdict is not against the great

13

weight of the evidence, the Court will not consider the causation issue.

### E. Comparative Fault

Plaintiff also contends that the Court's decision to allow comparative fault to be introduced as evidence was unduly prejudicial since plaintiff had already rested his case. Plaintiff avers that this ruling allowed the jury to shift the blame to Charity Hospital. The Court finds this contention meritless. Evidence of comparative fault would have affected plaintiff's case only if the jury found that NorthShore violated EMTALA. If the jury had found such a violation, the evidence could have been used to reduce plaintiff's damages in proportion to the fault of others. Since the jury found that NorthShore did not violate EMTALA, any evidence of comparative fault was not prejudicial.

## IV. Conclusion

For the foregoing reasons, the Court DENIES plaintiff's Motion for Judgment as a Matter of Law or, Alternatively, Motion for a New Trial.

New Orleans, Louisiana, this 10th day of October 2008.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE